[Civ. No. 25033. Second Dist., Div. One. Sept. 21, 1961.]

GENEVIEVE H. DOWTY, Appellant, v. PRUDENTIAL INSURANCE COMPANY OF AMERICA (a Corporation) et al., Respondents.

752

John F. O'Hara, Mark Wood and Anthony T. Oliver, Jr.,
for Appellant.

Adams, Duque & Hazeltine, James S. Cline, Mitchell &
Strange and George C. Mitchell for Respondents.

WOOD, P. J.—Appeal by plaintiff from order granting
defendants' motions for a new trial.

On January 28, 1952, Gerald F. Dowty, husband of plain-
tiff, obtained a policy of life insurance (issued on his life)
wherein plaintiff was named the beneficiary.

On December 23, 1956, Mr. Dowty was killed while he was
piloting an airplane.

In the first cause of action herein plaintiff sought to reform
the life insurance policy so that it would include insurance
covering the risk of her husband's being killed while he was
piloting an airplane. The alleged basis for reformation was
that such a provision was omitted from the policy by reason
of fraud and mistake on the part of defendant Prudential, and
by reason of mistake on the part of plaintiff and her husband.

In the second cause of action plaintiff sought recovery under
the policy as reformed.

The first and second causes of action were tried without a
jury, and the judge found there was no fraud or mistake; and
he rendered judgment for defendant Prudential.

The third cause of action was tried with a jury, and the verdict was in favor of plaintiff and against Prudential and Creighton (its agent) for $16,000 damages. Judgment was entered in accordance with the verdict. Each defendant made a motion for a new trial as to the third cause of action. (It appears that the motions were referred to, in the minutes, as one motion, i.e., defendants' motion for a new trial.) The motions (as so referred to) were granted on all the grounds stated in the motions, which grounds included: insufficiency of the evidence to justify the verdict; errors in law; and excessive damages.

Appellant (plaintiff) contends that there is no substantial conflict in the testimony on material issues; and that the evidence would be insufficient, as a matter of law, to support a verdict in favor of the defendants.

Defendant Creighton was an agent of defendant Prudential for the purpose of soliciting applications for life insurance. In order to obtain prospects for insurance, he mailed circular letters to many persons each month. His first interview with Mr. and Mrs. Dowty was pursuant to their reply to such a letter. He went to their home on January 14, 1952, and discussed insurance on the life of Mr. Dowty. According to testimony of Mrs. Dowty, they told the agent that they wanted ''a mortgage insurance'' and also ''aviation coverage,'' and that they wanted the insurance to pay off the mortgage of $8,000 on their home—insurance to cover him when he was flying an airplane; the agent said ''that as far as flying an airplane, it wasn't any more dangerous than driving a car, that we didn't even need to mention it, but we said we wanted to be covered, with my husband flying an airplane, in case anything ever happened, that was what we wanted, so my husband filled out this aviation [Aviation Questionnaire]''; that the agent ''explained this type of insurance to us, and it sounded pretty good, it would have a savings when my husband reached the age of 65, even though the premiums were a bit higher than we expected''; the agent also told them ''about the double indemnity, and we took that, and then this rider [aviation rider] would cost a little extra, but we told him we wanted it''; that, with respect to the aviation rider which was to cover her husband when he was flying an airplane, the agent said he would have to turn the application in to the insurance company ''to find out where [whether] the insurance could insure'' her husband; the agent said that her husband would have to take a physical examination, and that ''it would be

decided after this was done.'' Mrs. Dowty testified further that the agent then filled out a paper or form which he said would have to be turned in with the application; that the agent, in filling out the application (and questionnaire), asked her husband questions, and then recorded his answers on the application; after her husband said that ''he flew,'' the agent ''filled that out''; after the agent finished filling out the application, he handed it to her husband, who signed it and gave it back to the agent; when her husband signed the application, he did not appear ''to be reading it.''

Mrs. Rowell, a neighbor of the Dowtys, called as a witness by the plaintiff, testified that she was present in the Dowty home when the agent was there (the first time) discussing insurance; the Dowtys and the agent discussed insurance that would cover the Dowty ''home in case of any accident of any type''; Mr. Dowty told the agent he wanted insurance that would cover the $8,000 mortgage on his home; when Mr. Dowty said that he ''flew,'' the agent said it was not necessary to mention that in the policy; that the Dowtys ''objected to it [not mentioning flying in the policy]'' on the ground that ''this [aviation coverage] was what they wanted''; the agent said that a rider could be put on covering the aviation and if that is what they wanted the premium would be higher; Mr. Dowty said that was the only way he wanted it; the agent asked how many hours he flew and how many hours he intended to fly; while the agent was asking questions, he was filling out an application or making notations; the agent asked questions and wrote the answers; when the agent finished writing he handed the application to Mr. Dowty and asked him to sign it; Mr. Dowty signed it and handed it back to the agent; she did not see Mr. Dowty read the application; the agent said he would send the application in, and he would return with the policy.

Mrs. Dowty testified further that the agent returned to the Dowty home two or three weeks after he wrote the application; and he showed the policy to them and said that it was just what they asked for; he showed them the aviation rider and said that her husband did not have to worry now ''that he was covered when he was flying his airplane and it was what we asked for, we had double indemnity, we paid the extra premium for that, and we paid the extra premium for the rider. . . .'' She testified further that her husband signed the aviation rider; the agent said that the rider ''had to do with the aviation risk,'' and that her husband was covered

while flying; the agent showed them the place on the policy where it states the first premium is $1.68 and another premium is $1.68, and he said that the first premium was for the double indemnity, and that the second premium was for the aviation rider; after her husband had signed the rider, the agent handed the policy to her husband who then gave it to her; she "folded it and put it up"; the next time she went to the bank, which was the following Friday, she put the policy in the safe deposit box. On cross-examination, Mrs. Dowty said that her husband had said he would give up flying; he had an airplane when he first came to California, but he had sold it prior to "taking out the policy"; she has read the answers which are on Part I of the Aviation Questionnaire, and those answers appear to be true (one of those answers was that her husband's interest in aviation was decreasing); her husband had a $10,000 policy of G. I. insurance and a $3,000 policy of group insurance, both of which covered risks while he was flying an airplane.

The policy which was delivered to Mr. Dowty at said time contained a rider which was entitled "Aviation Risk Exclusion Provision." The provision was to the effect that aviation risk insurance was excluded from the policy. When the policy was delivered, Mr. Dowty signed an authorization form, which stated that Prudential was authorized to amend the application for the policy so that the policy was issued with the "Aviation Risk Exclusion Provision" attached to the policy. Mr. Dowty signed two authorizations—one such authorization was attached to the policy and remained in the possession of the Dowtys, and the other such authorization was returned by the agent to the Prudential company.

The records of the bank showed that the safe deposit box (where the policy was left) was not opened until approximately five weeks after the policy was delivered to the Dowtys.

Mrs. Dowty removed the policy from the safe deposit box and took it to her home in November 1956.

Mr. Creighton, the agent, testified he did not specifically recall being at the Dowty home in January 1952, for the reason that during that time he solicited insurance at several homes each night; he assumes, however, that he was at the Dowty home since he (witness) signed the Aviation Questionnaire and he signed, and wrote answers on, Part I of the application. He testified further that Mr. Dowty did not request aviation insurance, and that if he had made such a request a notation regarding it would have been made by the witness

(agent) under item 15 of the application (which is the special request column on the application); that his (agent's) commission was predicated on the amount of the premium, and the aviation coverage would have cost more, and he would have made more commission—the company was issuing that coverage upon request; if aviation coverage had been requested, there would have been no need for a special rider—the provisions of Prudential's basic policy (except for double indemnity) covered death while flying; if Mr. Dowty had desired to pay the additional premium for aviation coverage, an exclusion rider would not have been necessary.

Question Number 20 of Part I of the application was as follows: ''Does the proposed insured intend to fly or has he flown within five years? (a) as a student pilot, pilot. . . .'' Mr. Dowty answered that question in the affirmative.

Mr. Creighton, the agent, testified further that since Question Number 20 was answered in the affirmative, he (agent) was required under the Prudential procedure to ask Mr. Dowty to complete the Aviation Questionnaire irrespective of whether aviation coverage was requested by him; that the questionnaire was not filled out because Mr. Dowty requested aviation coverage, but was filled out because he had answered Question Number 20 in the affirmative.

With respect to the first and second causes of action, the court found, in part, as follows: During January 1952, defendant Creighton was a soliciting agent of Prudential, but he did not have actual authority to modify a policy of insurance or to bind Prudential by oral representations. Mr. Dowty executed the application for the policy voluntarily and not as the result of fraud or mistake on the part of Creighton or Prudential. The policy, in the face amount of $8,000 and naming Mrs. Dowty as beneficiary, was delivered to Mr. Dowty about January 28, 1952, and said policy was thereafter in the possession of Mr. and Mrs. Dowty. When the policy was delivered it contained an aviation exclusion rider, and at that time Mr. Dowty executed an authorization form whereby he agreed a copy of the rider was to be attached to the policy. He accepted the policy and executed said authorization form voluntarily and not as the result of fraud or mistake on the part of Creighton or Prudential. There was no substantial evidence that Mr. Dowty did not read the policy and the authorization form, and therefore it is presumed that he did read said documents.

As above indicated, appellant (plaintiff) contends

that the court erred in granting a new trial in that there was no substantial conflict in the testimony on material issues. One of the grounds upon which the new trial was granted was insufficiency of the evidence to support the verdict in favor of plaintiff. Plaintiff argues to the effect that since defendant Creighton, the agent, did not remember specifically the occasions when he was at the Dowty home soliciting the insurance and delivering the policy, the testimony of plaintiff and her neighbor must be accepted as true. The agent testified that he did not specifically recall those occasions for the reason he was soliciting insurance at several homes each night and the calls were in effect routine matters. He knew, however, from his method of soliciting insurance and from his writing on the application and other documents that he had been there. He denied that he made any of the alleged false statements attributed to him. He testified that he wrote answers on the application. The application was signed by Mr. Dowty. The application does not show that Mr. Dowty requested aviation insurance. The agent testified that if Mr. Dowty had requested such coverage the request would have been stated on the application. He also testified to the effect that he would have received a higher commission if aviation insurance had been included, and that at that time the company would have issued such insurance upon request, and furthermore there would have been no need for a special rider regarding aviation if aviation coverage had been requested. It does not appear that any object would be accomplished by the agent or the company in not providing aviation insurance if it had been requested. The Dowtys did not initiate the matter of obtaining insurance. The agent had sent a circular letter to them, and to many others in new tract homes, regarding insurance to cover mortgages. The Dowtys, in replying to the circular, had indicated interest in such insurance. The amount of their mortgage was $8,000, and that was the face amount of the policy. When the policy was delivered by the agent, there was a rider thereon which provided that aviation insurance was not included. Mr. Dowty signed that rider, and he also signed a copy of the rider which was to be retained by the company. Thereafter, and until the death of Mr. Dowty, the policy was in the possession of the Dowtys about four years. Mrs. Dowty said she took the policy to the safe deposit box on the next Friday after the policy was delivered on January 28, 1952. The records of the bank show that the box was not opened until approxi-

mately five weeks after that date. In November 1956, about a month before Mr. Dowty died, Mrs. Dowty removed the policy from the box and took it to her home. There was evidence to the effect that Mr. Dowty's interest in piloting an airplane had decreased at the time he applied for the insurance. He had two policies of insurance which covered risks while he was piloting an airplane.

In ruling upon the motions for a new trial, the trial judge was entitled, of course, to consider all the circumstances with respect to obtaining and possessing the policy. Although the agent did not remember specifically the occasions when he was at the Dowty home, the trial judge might have considered that the testimony as to alleged express or implied misrepresentations was contradicted by the circumstances; or he might have disbelieved the witnesses for plaintiff. In *Jenks* v. *Carey*, 136 Cal.App. 80, it was said at page 85 [28 P.2d 91] : "[T]he most positive testimony may be contradicted by circumstances in evidence in connection with the matter . . . and the manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statements. . . . As was said in *Blankman* v. *Vallejo*, 15 Cal. 638, a court may reject the most positive testimony, although the witness be not contradicted by direct testimony impeaching him or contradicting his statements.''

 In the present case, the trial judge determined the issues of the first and second causes of action—the issues as to reformation of the policy, and as to recovery under the policy as reformed. As above shown, the judge's findings on those issues were to the effect that there was no fraud or mistake with respect to issuing the policy; and his judgment was that the policy should not be reformed. It thus appears that the findings of the trial judge on the questions of fraud and mistake were directly opposed to findings of the jury on those questions. In ruling upon the motions for a new trial (as to the third cause of action wherein the jury's verdict was opposed to the findings of the judge in the first and second causes of action), a consistent ruling by the judge would require the granting of the motions.

 ''In considering the sufficiency of the evidence on the hearing of a motion for new trial it is the exclusive province of the trial court to judge the credibility of the witnesses, to determine the probative force of testimony and to weigh the evidence, and it may draw reasonable inferences therefrom opposed to those drawn by the trier of fact at the trial.

[Citations.] █ It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse an order granting a new trial on this ground. [Citations.] █ Error is not presumed and the burden is upon the plaintiffs herein to affirmatively show its presence in the record [citations] or a manifest and unmistakable abuse of discretion." (*Yarrow* v. *State*, 53 Cal.2d 427, 434 [2 Cal.Rptr. 137, 348 P.2d 687].)

█ In the present case, there was no abuse of discretion in granting the motions for a new trial on the ground of insufficiency of the evidence to support the verdict. The court did not err in granting the motions on that ground.

In view of the above conclusion, it is not necessary to determine other contentions on appeal.

The order is affirmed.

Lillie, J., concurred.